UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-23431-CIV-SEITZ/SIMONTON

MARY MAGAZINE,

    Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD. d/b/a
ROYAL CARIBBEAN INTERNATIONAL,

    Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant's Motion for Final Summary Judgment [DE-41]. This action arises from a broken leg suffered during a private lesson on the FlowRider, a surfing simulator aboard one of Defendant Royal Caribbean Cruises, Ltd. ("RCL")'s cruise ships. The essence of Plaintiff Mary Magazine's single-count complaint is that RCL failed to follow its own procedures and thus negligently increased the risk of Magazine's injury, principally by failing to warn her of the risk of injury on the FlowRider and by negligently instructing her in its use.

Having considered the motion, the response [DE-48] and reply [DE-52] thereto, the oral argument of counsel on March 20, 2014, and all of the evidence in the light most favorable to the Plaintiff, the Court will grant the motion as to the allegations that RCL caused an unreasonably dangerous condition under the circumstances, negligently designed and maintained the FlowRider, and negligently failed to warn of the risk of injury therefrom. It will deny the motion as to the allegation that RCL negligently instructed Magazine in the use of the FlowRider, as the Parties' papers have not addressed Magazine's counsel's argument at the March 20, 2014 hearing that the instructors' hand-off of the balancing rope contributed to the risk of Magazine's injury.

I.   **Factual Background**

On September 18, 2011, Plaintiff Mary Magazine, a 59-year-old attorney and Miami, Florida resident, departed on a Card Player Cruise aboard the *Allure of the Seas*, one of RCL's cruise ships. The FlowRider is a surfing simulator, installed on the *Allure of the Seas* and other RCL vessels, that uses powerful jets of water to create a continuous, artificial wave on which participants try to surf or ride using either a bodyboard or a surfboard (or "flowboard"). Unlike ocean waves, the FlowRider's artificial wave consists of only 1 – 3 inches of water above a "stationary, tensioned vinyl matted fabric surface" above a "rigid or fiberglass or PVC subsurface." ("Express Assumption of Risk – Waiver & Release of Liability – FlowRider Onboard Activity Waiver – General Terms & Conditions" [DE-41-3] ("FlowRider Waiver") at 2.)

Almost 2 weeks earlier, on September 6, 2011, Magazine had electronically registered to participate in various activities on the cruise, including ice skating, rock climbing, zip lining, and the FlowRider. As part of the registration process, Magazine checked boxes for each activity and electronically signed the FlowRider Waiver.[1] She knew at the time that checking boxes meant "signing something," which may have included warnings, but does not recall seeing any of the content of the FlowRider Waiver. She did not take additional steps at the time to research any of the activities. Once aboard the ship, she signed up for a FlowRider lesson. Because she was taking a lesson, and because she had previously participated in numerous sports without injury, she did not expect to be injured on the FlowRider. (FlowRider Waiver; Dep. of Mary Magazine [DE-41-2] ("Magazine Dep.") 44:1 – 53:4, 69:17 – 22, 122:15 – 123:1.)

---

[1]   The parties agree that the FlowRider Waiver is unenforceable under *Johnson v. Royal Caribbean Cruises, Ltd.,* 449 F. App'x 846 (11th Cir. 2011).

RCL contends that it warns its passengers of the risks associated with the use of the FlowRider in several ways, all of which Magazine testifies she did not see before her accident. These include the FlowRider Waiver, a "Caution" sign in a viewing area near the FlowRider entrance, a 5-minute safety video that plays on certain television channels in the guests' staterooms, and a 8.5" x 11" sheet on a bulletin board.

On September 20, 2011, Magazine and two other passengers participated in a private FlowRider lesson, which cost $60 per person. One of the instructors asked Magazine about the knee brace she was wearing, and she responded that she'd had a knee replacement and used a brace "just for stability purposes." Neither instructor said anything further about her knee. (Magazine Dep. 76:17 – 78:6.) There is no evidence that any instructor at this time warned Magazine of any risks associated with the FlowRider or inquired as to her understanding of those risks.

During the lesson, Magazine received verbal instructions from two RCL FlowRider instructors, though she does not remember the instructions in detail. She first watched another member of her group practice balancing on the board while receiving instruction, lose his balance, fall to the back of the FlowRider, and return to wait in line to ride again. Then, on Magazine's turn, an instructor initially held her hand while she practiced standing on and maneuvering the flowboard. She was barefoot at this time and throughout the lesson. The instructor then let go of her hand, and Magazine tried to maintain her balance on her own until she fell and was carried by the water to the back of the FlowRider. She returned to wait in line to ride again, ultimately falling and returning to practice riding the FlowRider a total of approximately 10 to 12 times. (*See* Magazine Dep. 78:10 – 81:3; Dep. of 30(b)(6)

representative of RCL, Alison Frazier [DE-42-1] ("RCL Dep.") 68:3 – 69:8; Pl.'s Notice of Serving Answers to Interrog. [DE-41-1] ("Pl. Interrog.") ¶ 8.)

After several rides, once the instructor seemed to think Magazine could balance without assistance, the instructors started using a balancing rope. One instructor would give her a rope, held by a second instructor standing near the front of the FlowRider, to hold with her right hand, while the first instructor held her left hand. Eventually the first instructor would let go of Magazine's left hand, and the second instructor would guide her with the rope towards the front and middle of the FlowRider, where the water flow was stronger than it had been further back and on the side. It is unclear how many times Magazine practiced with the balancing rope in this way before her injury. (*See* Magazine Dep. 108:16 – 109:12; Pl. Interrog. ¶ 8.)

During Magazine's last ride, she was holding the rope while the second instructor guided her to the front and middle of the FlowRider as described above. The video of her accident[2] shows that the second instructor, who had initially been holding the rope, handed the rope to the first instructor. Soon thereafter, Magazine lost her balance and fell backwards into the water. Her legs separated and she lost control of the flowboard. Her fall resulted in a spiral fracture in her femur and ultimately in permanent nerve damage, numbness, tingling, and a pronounced limp. (*See* Magazine Dep. 112:7 – 119:8; Pl. Interrog. ¶¶ 8, 10; Dep. of Kevin Breen [DE-44-1] ("Breen Dep.") 80:8 – 81:23; Def's Mot. for Final Summ. J. [DE-41] ("SJ Mot.") at 7 ¶ 27; Pl.'s Resp. in Opp'n to Def.'s Mot. for Final Summ. J. [DE-48] ("Response") at 8 ¶ 27.)

---

[2]   The video of Magazine's accident was not part of the summary judgment record, but the testimony in the record refers frequently to this video. (*See, e.g.,* Magazine Dep. 23:17 – 19.) Thus, the Court asked the Parties to provide it to the Court at the March 20, 2014 hearing.

**II.     Legal Standard**

General maritime law controls the present action, as it involves an alleged tort committed aboard a ship in navigable waters. Therefore, the elements of negligence are: "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citing *Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008)). In the maritime context, "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Id.* (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)).

"Summary judgment is appropriate only when, after viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party, the court nonetheless concludes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. The moving party carries the initial burden of production, which can be met by showing that the nonmoving plaintiff has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Fickling v. United States*, 507 F.3d 1302, 1304 (11th Cir. 2007) (citations omitted).

Once the moving party's burden is met, the nonmoving party, having had the opportunity to conduct full discovery, must demonstrate that there is factual support for each element necessary to establish each claim it wishes to pursue at trial. If the nonmoving party cannot do so, then summary judgment is proper because "a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**III.     Analysis**

Magazine alleges that RCL breached its duty of care in five ways: (1) by causing an "unreasonably dangerous condition" on the FlowRider; (2) by negligently maintaining and (3) negligently designing the FlowRider; (4) by failing to warn her of the risk of injury; and (5) by negligently supervising and instructing[3] her in its use.

As to the claims of negligent design and negligent maintenance, Magazine's counsel conceded at the March 20, 2014 hearing that RCL did not design the FlowRider and that there is no evidence of negligent maintenance. (*See also* SJ Mot. at 9 ¶¶ 34 – 37; Response at 10 ¶¶ 34 – 37.) To be liable for negligent design, a defendant must have played some role in the design. *See Rodgers v. Costa Crociere, S.P.A.*, 410 F. App'x 210, 212 (2010) (affirming summary judgment for defendant where there was no evidence that defendant had actually designed the relevant area). Therefore, summary judgment is proper as to the claims of negligent design and negligent maintenance.

Magazine's counsel also argued at the hearing that RCL's "caus[ing] an unreasonably dangerous condition" was an independent theory of negligence. However, there is no evidence in the record supporting the existence of any such "unreasonably dangerous condition" that is distinct from the allegations of RCL's failure to warn, negligent design, negligent maintenance, and negligent instruction.

---

[3]     Although the Complaint alleges that RCL "negligently supervised" Magazine, the Parties now characterize this claim as "negligent supervision and instruction." (SJ Mot. at 16; Response at 25.) There is no evidence that RCL inadequately supervised or trained its instructors; rather, Magazine argues that RCL's instructors were negligent towards her during her FlowRider lesson. As such, the claim is more accurately described as negligent instruction.

Therefore, summary judgment is proper as to a separate claim that RCL caused an unreasonably dangerous condition under the circumstances.

The Court now turns to the remaining theories of negligence: that RCL failed to warn Magazine of the FlowRider's risks and negligently instructed her in its use.

### A. RCL's Duty to Warn

A shipowner's duty of reasonable care includes a duty to warn passengers of dangers of which the shipowner knows or should know but which may not be apparent to a reasonable passenger. *Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351, 1357 (S.D. Fla. 2013). The duty to warn does not extend to dangers that are "open and obvious." *Id.* "The obviousness of a danger and adequacy of a warning are determined by a 'reasonable person' standard, rather than on each particular plaintiff's subjective appreciation of the danger. Individual subjective perceptions of the injured party are irrelevant in the determination of whether a duty to warn existed." *John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1351 (S.D. Fla. 2008) (citations omitted).[4]

RCL maintains that it reasonably warned Magazine multiple times of the risks posed by the FlowRider. (SJ Mot. at 11 – 14.) RCL points to the FlowRider waiver, a "Caution" sign, a 5-minute safety video that plays on certain television channels in the guests' staterooms, and a 8.5" x 11" sheet on a bulletin board.

---

[4]   *See also* Restatement (Third) of Torts: Phys. & Emot. Harm § 18, cmt. f (2010):

> [T]here generally is no obligation to warn of a hazard that should be appreciated by persons whose intelligence and experience are within the normal range. When the risk involved in the defendant's conduct is encountered by many persons, it may be foreseeable that some fraction of them will be lacking the intelligence or the experience needed to appreciate the risk. But to require warnings for the sake of such persons would produce such a profusion of warnings as to devalue those warnings serving a more important function.

"Whether adequate efforts were made to communicate a warning to the ultimate user and whether the warning if communicated was adequate are uniformly held questions for the jury." *Stapleton v. Kawasaki Heavy Indus., Ltd.*, 608 F.2d 571, 573 (5th Cir. 1979), *modified on other grounds*, 612 F.2d 905 (5th Cir. 1980). At summary judgment, the Court must accept Magazine's testimony that she did not see any of these warnings.

Instead, as detailed below, the dispositive issues are (1) proximate causation and (2) the lack of duty to warn of open and obvious dangers. RCL has two arguments about these issues. First, any alleged failure to warn was not the proximate cause of Magazine's injury because she "testified that she would not have heeded warnings anyway." (SJ Mot. at 14.) Second, "the risk of falling and suffering an injury on the FlowRider is surely open and obvious under the facts of this case." (*Id.* at 15 – 16.)

### 1. Applicable Law

In any negligence claim, the plaintiff must show that the defendant's breach of duty actually and proximately caused the plaintiff's injury. *Hercules Carriers, Inc. v. Claimant State of Florida*, 768 F.2d 1558, 1566 (11th Cir. 1985) ("[F]ault in the abstract is not sufficient. To produce liability, the acts of negligence . . . must be a contributory and proximate cause of the accident."). This requires that the defendant's breach "be a substantial factor in bringing about the harm." *Chavez v. Nobel Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978). Thus, to prove that a defendant's failure to warn caused an injury, the plaintiff must show that the *risk* about which the defendant failed to warn the plaintiff caused the injury.

In addition, as noted above, a defendant has no duty to warn a plaintiff about dangers that are open and obvious.[5] Therefore, to prevail on a negligence claim predicated on a defendant's failure to warn, a plaintiff must identify a specific risk (1) of which the defendant had notice or constructive notice, (2) that is not open and obvious, (3) about which the defendant failed to warn the plaintiff, and (4) that actually caused the plaintiff's injury. *See, e.g., Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (plaintiffs had adequately stated claim that cruise line breached its duty to warn plaintiffs about the high prevalence of gang-related violence in Coki Beach that caused one plaintiff's death). As neither party identifies the relevant risk with adequate specificity in their written or oral arguments, the Court must glean the types of potentially relevant risks from the Parties' papers and the record. For the reasons stated below, the Court finds no evidentiary support for a reasonable jury to conclude that *any* risk exists in this case that meets all four criteria essential to a negligent-failure-to-warn claim.

### 2. Identifying the Relevant Risk

#### a. Risk of Falling on the FlowRider

The relevant risk is not simply that one might fall on the FlowRider, as RCL appears to argue at times. (*See, e.g.*, SJ Mot. at 16 ("Plaintiff's expert and Carnival's [sic] expert both agreed that falling on the FlowRider is an obvious risk.").) A reasonable jury could conclude that a first-time participant is virtually guaranteed to

---

[5]   The lack of a duty to warn of open and obvious dangers is related to the requirement of proximate causation because "warning of an obvious or generally known risk in most instances will not provide an effective additional measure of safety," particularly as such warnings "may be ignored by users and consumers and can diminish the significance of warnings about non-obvious, not-generally-known risks." *Veliz v. Rental Serv. Corp. USA, Inc.*, 313 F. Supp. 2d 1317, 1323 (M.D. Fla. 2003) (citation omitted).

fall on the FlowRider.[6] However, a fall that results in a spiral fracture and permanent nerve damage is not in the same category as the 10 – 12 earlier falls that Magazine described as "actually kind of fun." (Magazine Dep. 107:13.) In fact, RCL's own expert stated that Magazine's injury resulted from "nuances of how she fell on this occasion, and not the fact that she just fell." (Expert Report of K. Breen [DE-43-2] at 7.)

### b. Risk of Serious Bodily Injury or Death

Instead, the relevant risk is the general risk of serious bodily injury or death on the FlowRider. In the circumstances of this case, this is the same risk as what RCL characterizes as "the risk of falling *and suffering an injury* on the FlowRider" (SJ Mot. at 15 (emphasis added)) and what Magazine describes as "that there was a chance that she would get hurt while participating in the FlowRider" (Response at 9 ¶ 30). Having identified the relevant risk, the Court finds that summary judgment is proper here for two reasons.

First, any failure by RCL to warn of this general risk did not proximately cause Magazine's injury. Magazine expressly testified that a warning sign referring only to a "risk of serious bodily injury or death" would not have stopped her from participating in the FlowRider (Magazine Dep. 111:22 – 112:2), and there is no indication in the record that such a warning might have reduced the severity of her injury. Therefore, any breach by RCL of a duty to warn Magazine of the risk of serious bodily injury or death did not proximately cause Magazine's injury.

Second, the general risk of injury on the FlowRider is open and obvious. The FlowRider is a recreational activity, and the risk of which Magazine argues she should

---

6       In fact, RCL's website advertises the opportunity to "cheer on friends from stadium seating with prime wipeout views" of the FlowRider, suggesting that RCL considers falling to be part of its appeal. *Things to do onboard*, ROYAL CARIBBEAN INTERNATIONAL, http://www.royalcaribbean.com/findacruise/experiencetypes/category.do?pagename=onboard _cat_things_to_do (last visited Mar. 24, 2014).

have been warned is created by the FlowRider itself, rather than by an anomalous condition in an otherwise safe area, such as a protruding nail or slippery substance on a walkway. Courts routinely recognize that sports and similar recreational activities pose an inherent risk of injury and that such inherent risk, in the absence of some hidden danger, is open and obvious. *See Lapidus v. NCL Am. LLC*, 924 F. Supp. 2d 1352 (S.D. Fla. 2013) (risk of heart attack from uneven terrain on a hike is open and obvious, but risk from invisible volcanic gasses might not be); *Balachander v. NCL Ltd.*, 800 F. Supp. 2d 1196 (S.D. Fla. 2011) (risk of drowning while swimming in the ocean is open and obvious); *Mendel v. Royal Caribbean Cruises, Ltd.*, No. 10-23398, 2012 WL 2367853 (S.D. Fla. June 21, 2012) (risk of slipping while exiting a swimming pool is open and obvious); *Young v. Carnival Corp.*, No. 09-21949, 2011 WL 465366 (S.D. Fla. Feb. 4, 2011) (risk of tripping while hiking is open and obvious).

Although Magazine argues otherwise, there is no evidence that the Court can extract from the record supporting the existence of any other risk that is not open and obvious and that could have contributed to her injury. The Court will now address each of the three risks suggested in Magazine's testimony and arguments.

### c. Surface of the FlowRider

Magazine argues that she probably would not have participated in the FlowRider if she had known "that the floor of the FlowRider is a metal surface covered with foam and was as hard as it was." (Response at 24.) She also testified that she had expected prior to her injury that the foam padding over the base of the FlowRider would be as thick as the padding at the back of the FlowRider (Magazine Dep. 102:6 – 103:3), in contrast to her understanding at the time of testimony that "[u]nderneath the surface of the FlowRider there's some kind of metal." (Magazine Dep. 88:7 – 9.)

If the FlowRider's surface were somehow more dangerous than a reasonable person might expect, that might justify requiring a warning. *See, e.g., Caldwell v. Carnival Corp.*, 944 F. Supp. 2d 1219, 1223 (S.D. Fla. 2013) (plaintiff had adequately stated claim that defendant breached its duty to warn of the slippery condition of its walkway). However, there is no evidence in the record, other than Magazine's speculation, suggesting that the subsurface of the FlowRider is made of metal or that there is any less padding than would have been apparent to Magazine from her earlier 10 – 12 rides or to any other FlowRider participant who had the opportunity to walk barefoot on the FlowRider's surface.

### d. Particular Medical Conditions

Magazine testified in her deposition that the FlowRider Waiver was inadequate partially because "[t]here's nothing . . . that I saw, that says if you have any kind of medical issues, that you should not go on this ride." (Magazine Dep. 90:6 – 8; *see also* Response at 8 ¶ 29.) If the FlowRider posed a danger to people with particular medical conditions in ways that a reasonable person with such medical conditions might not expect, that too might justify requiring a warning. However, Magazine expressly states that her knee condition did not cause her injury (Magazine Dep. 126:5 – 127:17), and there is no evidence in the record suggesting that Magazine had any other such medical condition that contributed to her injury. Therefore, any failure to warn Magazine about a risk to those with particular medical conditions did not proximately cause Magazine's injury.

### e. Previous Injuries on the FlowRider

Magazine also appears to argue that RCL had a duty to inform her that people had previously been injured on the FlowRider. She states in her interrogatory

responses that "if I had been advised of all the serious injuries that other RCL guests had experienced I would not have even taken a lesson." (Pl. Interrog. ¶ 9.) In her deposition, Magazine described the FlowRider Waiver as inadequate partially because "they don't tell you how many people have been injured on this thing." (Magazine Dep. 90:2 – 13; *see also* Response at 8 ¶ 29.) Magazine now emphasizes that "at least one person died using the FlowRider and some 147 more were severely injured using it in the short time between the maiden voyages of the Allure of the Seas and Oasis of the Seas and Plaintiff's accident" whereas "[n]o guest has ever died using any other onboard activities." (Response at 27 – 28.)

This argument fails because it does not point to the existence of a non-open-and-obvious risk that could have proximately caused Magazine's injury. It demonstrates that the FlowRider posed a risk of serious bodily injury or death and that RCL knew of this risk.[7] However, RCL is not contesting these points; in fact, RCL's primary argument is that RCL adequately warned Magazine of the risk of serious bodily injury or death. Magazine has pointed to no other authority, either in law or in customary practice, imposing a duty to inform passengers of specific numbers of injuries. (*See* Dep. of Daniel Connaughton, Ed.D. [DE-43-3] ("Connaughton Dep.") 107:5 – 15.)

### 3. Failure of Proof on Essential Element of Claim

Put simply, while Magazine contends that certain warnings should have been more prominently displayed, she has not identified any risk *about which she should have been warned differently* such that a warning might have made a difference. The

---

[7] The list of injuries includes some fractures but also many sprained ankles and toe contusions, which are difficult to characterize as "severe" or as substantially similar to Magazine's injury. (*See* Def.'s First. Suppl. Resp. to Pl.'s Req. for Produc. [DE-48-5]; Def's Notice of Serving First Suppl. Resp. to Pl.'s Interrog. [DE-48-6].)

only risk that materialized was the general risk that one could fall and be injured on the FlowRider, which was so open and obvious that Magazine admits that a warning referring only to this general risk would not have mattered. Magazine has not pointed to any other risk about which there was any basis to expect a warning. As such, there is no genuine issue of material fact as to the claim that RCL breached its duty to warn.

### B. Issues of Fact As To Negligent Instruction

RCL moves for summary judgment on Magazine's negligent instruction claim on the grounds that (1) Magazine "avers that she received thorough instruction" from the instructors; (2) the "instructor's use of a balancing rope to aid the FlowRider passengers was reasonable under the circumstances;" and (3) "there is no record evidence that RCL was on notice that the use of the balance rope was improper." (SJ Mot. at 16 – 18.)

Magazine responds that (1) a reasonable instructor should ensure that participants understand the relevant risks, such as by requiring viewing of the safety video and providing an explicit opportunity for questions; (2) the use of a balancing rope is "not referenced anywhere as an acceptable balancing or teaching method" in the relevant FlowRider manuals (Response at 25); and (3) RCL failed to provide "reasonable instructional progression including the use of a bodyboard prior to stand-up riding, as suggested by Wave Loch/FlowRider." (Report of Daniel Connaughton, Ed.D. [DE-40-1] at 7.) Additionally, at oral argument, Magazine's counsel pointed to a few seconds of the accident video to support the argument that the hand-off of the balancing rope from one instructor to another contributed to Magazine's loss of balance and subsequent injury.

The Court has already addressed RCL's alleged failure to warn. Reasonable care by an instructor may very well include ensuring that participants understand the relevant risks. However, Magazine's claim on this ground fails due to a lack of proximate causation and because the relevant risk was open and obvious.

As Magazine's expert concedes, there is no evidence in the record that any failure by RCL to provide a bodyboard contributed to the risk of Magazine's injury. (Connaughton Dep. 52:7 – 56:3.) Therefore, this argument fails as well.

However, because the Parties' briefing did not address Magazine's counsel's argument at the March 20, 2014 hearing regarding the transfer of the balancing rope, the Court cannot conclude at this time, as a matter of law, that RCL's instructors necessarily exercised reasonable care in their *handling* of the balancing rope, and that such breach did not heighten the risk of Magazine's injury.[8] While the Court is not deciding this issue of law at this time, in a paid lesson for a sport or similar recreational activity such as the FlowRider, reasonable care by an instructor *may* include not exposing a plaintiff to risks beyond those inherent in the recreational activity itself, at least not before the plaintiff is ready to handle those risks.[9]

---

[8]     There is no evidence undercutting RCL's contention that the instructors had received all of RCL's training to become a FlowRider instructor. (RCL Dep. 67:14 – 68:19; SJ Mot. at 6 ¶ 19; Response at 6 ¶ 19.) This may preclude a finding that their use of the balancing rope was *inherently* improper. (Connaughton Dep. 25:4 – 26:15.) However, this does not address whether the instructors exercised reasonable care in *handling* the balancing rope.

[9]     Federal courts exercising admiralty jurisdiction "may draw guidance from, *inter alia*, the extensive body of state law applying proximate causation requirements and from treatises and other scholarly sources." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 831 (1996). State law reveals a range of approaches. *Compare, e.g., Alber ex rel. Albert v. Ober Gatlinburg, Inc.*, No. 3:02-CV-277, 2006 WL 208580, at *5, *8 (E.D. Tenn. Jan. 25, 2006) (denying summary judgment on the grounds that (1) reasonable care meant not exposing skiers to risks that "were not an inherent risk of skiing" and (2) genuine issues of material fact remained as to "the adequacy of the ski lesson . . . and whether that lack of instruction was a proximate cause of [plaintiff's] fall and injuries.") *and Derricotte v. United Skates of Am.*, 794 A.2d 867, 871 (N.J. Super. Ct. App. Div. 2002) ("[P]laintiff's fall as a result of the rink's alleged negligence in teaching her how to skate was not an 'inherent,' 'obvious' or 'necessary' risk of skating.") *with*

Magazine testified that the instructor holding the rope pulled her closer to the front and the middle of the FlowRider, where the water flow was considerably stronger, before she was ready, resulting in her being unable to control the flowboard as she fell. (Magazine Dep. 116:10 – 17, 118:7 – 119:8.) Furthermore, a jury could view the video of Magazine's accident as corroborating her testimony and as showing that the hand-off of the balancing rope contributed to the risk of Magazine's injury.

The Parties' papers did not address Magazine's claim as framed in this fashion. Given this framing, these issues remain:

> (1) Did the instructors' handling of the balancing rope contribute to the risk of Magazine's particular injury?
>
> (2) Was the resulting risk greater than the inherent risk of injury on the FlowRider?

RCL's response that "the rope helped to maintain Plaintiff's balance before she fell" (SJ Mot. at 7 ¶ 24) does not adequately address these issues. The relevant risk is not of falling but of falling in a way likely to result in injury, such as by losing control of the board while falling. RCL's argument that "there is no record evidence that RCL was on notice that the use of the balance rope was a danger to any passenger" (SJ Mot. at 18) is also not dispositive, because the requirement of notice applies to risks created by passive conditions such as slippery walkways or protruding nails, not to risks created by a defendant's actions. *See Long v. Celebrity Cruises, Inc.*, No. 12-22807, 2013 WL 6043918, at *3 (S.D. Fla. Aug. 1, 2013) (collecting cases).

RCL also argues that Magazine's testimony is speculative and therefore insufficient to defeat summary judgment. However, the direct testimony of an accident

---

*Fredrickson v. Mackey*, 413 P.2d 86, 89 (Kan. 1966) (offering horse-riding lessons does not turn a defendant into an "insurer against all possibility of injury or accident").

victim about her own accident is not "speculation." The two cases that RCL cites are not applicable. (Def.'s Reply in Supp. of Mot. for Final Summ. J. at 10.) The first case, *Putman v. Sec'y, Dep't of Veterans Affairs,* 510 F. App'x 827 (11th Cir. 2013), addresses the procedurally distinct burden-shifting framework of employment discrimination. The second case, *Doe v. NCL (Bahamas) Ltd.*, No. 11-22230, 2012 WL 5512347 (S.D. Fla. Nov. 14, 2012), involves a plaintiff's initial speculation that contradicted that same plaintiff's later representations to the court, rather than a plaintiff's testimony on a subject about which she has personal knowledge.[10]

Because the Parties have not focused on the reframed issues, the Court cannot conclude at this time that there are no genuine issues of material fact as to (1) whether the instructors' handling of the balancing rope breached their duty of reasonable care under the circumstances and (2) whether any such breach actually and proximately caused Magazine's injury. The Court is mindful that accidents, sadly, do happen, and a cruise ship operator "is not an insurer of its passengers' safety. There thus must be some failure to exercise due care before liability may be imposed." *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988) (citation omitted). If Magazine fails to establish the necessary evidentiary support for this claim at trial, the Court will entertain a motion for a directed verdict after she rests her case.

### IV.  Conclusion

Accordingly, it is

ORDERED that

1. Defendant's Motion for Final Summary Judgment [DE-41] is GRANTED IN PART AND DENIED IN PART as follows:

---

[10]     Magazine's testimony about her accident thus differs from her speculation as to the composition of the FlowRider's subsurface.

a) GRANTED WITH PREJUDICE with respect to Magazine's allegation that RCL "caused an unreasonably dangerous condition under the circumstances."

b) GRANTED WITH PREJUDICE with respect to Magazine's allegation that RCL "negligently maintained the Flowrider in question."

c) GRANTED WITH PREJUDICE with respect to Magazine's allegation that "the Flowrider in which the Plaintiff fell was negligently designed."

d) GRANTED WITH PREJUDICE with respect to Magazine's allegation that RCL "failed to warn the Plaintiff and fellow passengers of a dangerous and hazardous condition about which it knew or should have known."

e) DENIED with respect to Magazine's reframed allegation that RCL negligently instructed her in the use of the FlowRider.

2. The deadline to file the Joint Pretrial Stipulation, proposed jury instructions and verdict form, and Motions *in Limine* and Responses [*see* DE-8 at 2] is EXTENDED to **April 10, 2014**.

3. The Pretrial Conference is RESCHEDULED to **1:30 pm** on **April 22, 2014**.

4. Defendant's Motion *in Limine* to Admit Evidence of Defendant's Warnings Regarding the FlowRider [DE-29] is DENIED as failing to comply with the requirements set in this Court's March 12, 2013 Order [DE-8 at 2].

DONE and ORDERED in Miami, Florida, this 27th day of March, 2014.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: The Honorable Andrea M. Simonton
Counsel of Record